STATE of Delaware

v.

James E. COOKE, Defendant.

Criminal Action Nos. IN–05–06–1529 thru IN–05–06–1533 and IN–05–06–2390 thru IN–05–06–2394, ID No. 0506005981.

Superior Court of Delaware, New Castle County.

Submitted: Jan. 8, 2007.
Decided: Jan. 19, 2007.

Steve P. Wood, Esquire, Deputy Attorney General, and Diane C. Walsh, Deputy Attorney General, Department of Justice, for State of Delaware.

J. Brendan O'Neill, Esquire, and Kevin J. O'Connell, Esquire, of Wilmington, Delaware, attorneys for the defendant.

### *OPINION*

HERLIHY, Judge.

Defendant James Cooke has been indicted for murder in the first degree (the deceased being Lindsey Bonistall), felony murder in the first degree (murder-rape of Lindsey Bonistall), rape first degree (Lindsey Bonistall), burglary first degree (Lindsey Bonistall's apartment), arson in the first degree (the apartment in which Lindsey Bonistall lived), reckless endangering first degree (relating to that apartment), burglary second degree (at the residence of Amalia Caudra), robbery second degree (Amalia Caudra), theft misdemeanor (involving Amalia Caudra), burglary second degree (the residence of Cheryl Harmon), and theft misdemeanor (involving Cheryl Harmon).

He has filed a series of motions *in limine* seeking to exclude proffered testimony in ten areas of the State's possible case-in-chief. Those areas are: (1) DNA prediction analysis (2) video enhancement, (3)

trace (hair) analysis, (4) toolmark analysis, (5) hair comparison, (6) fingerprint analysis, (7) voice identification analysis, (8) footwear analysis (9) fabric impression analysis, and (10) handwriting comparison. He is able to make these motions because the State supplied reports from each of the examiners in these subject areas. In each of the original motions on all this evidence, he raises a challenge to the qualifications of the expert. Most of the test results in these areas were inconclusive (could not rule him out or in) and in some instances, the test result is exculpatory. Cooke challenges the relevance and admissibility, however, of all of these results. With each of these areas of evidence, he also initially requested a *"Daubert"*[1] hearing to pursue his challenges to the expert's qualifications and opinions. In the case of the handwriting analysis in which the examiner has opined that there is a connection between Cooke and the Bonistall charges, he has recently raised an additional objection that some of the exemplars were obtained in violation of his Fifth Amendment rights.

### I. Procedural History

The Court met with counsel on November 1st to schedule the *"Daubert"* hearing and to frame the issues for that hearing which Cooke's motions had raised. In a letter to the Court dated November 2, 2006, the State indicated it was not going to seek to introduce the DNA prediction evidence.[2] When discussing the issue of witness qualifications, it was revealed that most of these witnesses were employed by the FBI, ATF or Delaware State Police to conduct tests and analysis in these respective subject areas. Defense counsel, however, had no curriculum vitae for these persons. An agreement was made, therefore, that the State would promptly supply

to defense counsel the CVs for each of these witnesses. It subsequently did so.

At the office conference, the parties and the Court worked out the procedures after Cooke received the experts' CVs. In those cases where he informed the State and the Court that he was satisfied with an expert's qualifications, his objection on that point would be deemed withdrawn. There would, as a result, be no need for a hearing involving any such expert. But Cooke's relevancy objection remained. In that instance, the Court would decide the issues Cooke raised on the parties written submissions.

The procedural agreement also was that, if Cooke maintained his objection about a witness' qualifications, the Court would make a preliminary ruling. If the Court had any concerns about witness qualifications, the matter would be set for a hearing. Also to be set for a hearing were any subject areas where Cooke or the Court believed the record needed expansion. There was a recognition that as to certain tests and experts because of scheduling problems, witness location or other factors, it would be necessary to conduct a *Daubert* hearing during the trial. This would be done, of course, outside of the jury's presence.

This agreement on the handling of Cooke's motions does not affect or diminish his right at trial to raise any new objection that may flow from questioning at trial. As far as the Court is concerned, where this opinion overrules any of his objections, they are preserved for any future purpose, if there is one. He need not, but can if he chooses, renew these objections at trial. Nor does this procedural agreement relieve the State of its obli-

---

1. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2. There will be other DNA evidence which the State will seek to introduce at trial, but it has not been the subject of any of these motions.

gations to establish each witness' qualifications at trial.

As will be discussed later, after receiving the expert witness CVs, Cooke withdrew his qualification objections for most, but not all of the witnesses. The hearing was shortened to two witnesses, one on handwriting analysis and the other on footwear comparison.

The nature of Cooke's objections and request for a *Daubert* hearing implicate this Court's "gate keeping" function regarding expert evidence.

## II. Parties' Claims

### A

As to each of the ten identified areas Cooke raises basically the same points. He correctly notes that for scientific evidence to be admissible this Court has to make certain determinations. Relying upon *Nelson v. State*,[3] his motion asks whether:

1. The expert witness is qualified (D.R.E.702);
2. The evidence is otherwise admissible, relevant, and reliable (D.R.E. 401 and 402);
3. The bases for the opinion are those reasonably relied upon by the experts in the field; (D.R.E.703);
4. The specialized knowledge being offered will assist the trier of fact to understand the evidence or determine a fact in issued; (D.R.E.702);
5. The evidence does not create unfair prejudice, confuse the issues, or potentially misleads the jury (D.R.E. 403).

Cooke then raises a series of questions in each motion, usually identical, about the substance of the proffered evidence:

1. The qualifications of (expert witness) are not known;

2. There is no basis to conclude that the (particular expert testimony) is reliable or admissible;
3. It is not known if the bases for (expert witness) opinions will not assist the trier of fact to understand the evidence or determine a fact in issue;
4. The reports, opinions and testimony of (expert witness) will not assist the trier of fact to understand the evidence or determine a fact in issue; and
5. The evidence will likely create unfair prejudice, confuse the issues and mislead the jury.

Primarily, however, Cooke focuses his motions on the fact that the results of the tests or comparisons were "at best" inconclusive. In short, he raises a relevancy question as to each of the ten areas of scientific or technical analysis.

### B

In response to Cooke's relevancy objection to most of the proffered evidence, namely that which is inconclusive or exculpatory, the State argues, also in general terms, that it needs to produce such evidence for the jury. First, it contends that it wants to demonstrate to the jury that it conducted a thorough investigation. Its second argument is related and a bit more focused. It asserts being able to produce this evidence before a jury addresses concerns the State has that jurors have or may have about heightened expectations of what the prosecution must do or show in order to meet its burden of proof. Some or all of this concern regarding heightened expectations is described colloquially as the "CSI Effect."

The State summarizes the argument on this point as follows:

---

3. 628 A.2d 69 (Del.1993).

Widespread media coverage of criminal trials and the popularity of television programs such as C.S.I. Crime Scene Investigation, C.S.I.—Miami and C.S.I.—New York (to name a few) have had the effect of developing unrealistic and preconceived notions in juror's minds about the availability and precision of forensic evidence in criminal trials. If not confronted by prosecutors, this so called "C.S.I. Effect" can lead to a misapprehension of the evidence actually introduced or encourage improper speculation by jurors during their deliberations. *See* Kit Roane, *The C.S.I. Effect*, U.S. News & World Report, April 25, 2005; Stefan Lougren, *C.S.I. Effect is a Mixed Blessing for Real Crime Labs*, National Geographic News, Sept. 23, 2004; Karin H. Cather, *The C.S.I. Effect: Fake TV and Its Impact on Jurors in Criminal Cases*, The Prosecutor, March/April 2004. *See also* Wikipedia, *The C.S.I. Effect*, *http://en.wikipedia.org/wiki/CSI—Effect*. The State must therefore be permitted to present the jury with the complete story of the investigation in this case, even if the particular technique in question, is as is the case in this instance, produced inconclusive results.[4]

### III. "CSI Effect"

The State's argument about the "CSI Effect" in response to Cooke's relevancy objections covers most of the test results. The reason is that some of the test results neither rule Cooke out or in as the source, some are exculpatory and some seem to have a limited purpose or result, again without revealing any link to Cooke. Because the State's "CSI Effect: contention addresses so many of the test results, the Court will address it globally without initially referencing any particular test result. As each test result is individually

discussed later, the Court will note the role of the "Effect", if any, in its decision to sustain or overrule Cooke's relevancy objection. Where the evidence is inculpatory, of course, this discussion does not apply.

The Court has independently researched for any literature on the so-called "CSI Effect." In the limited literature found, there is a curious divergence of opinion on whether there is such a phenomenon. Two authors conclude basically that there is not. Several other reports believe that there is.

The first of the two authors questioning the existence of the so-called "CSI Effect" is Professor Tom R. Tyler. He teaches (or taught) psychology at New York University and also is the associate editor of New York University's Annual Review of Law and Science. His conclusion is that:

> The CSI effect has become an accepted reality by virtue of its repeated invocation by the media. Although no existing empirical research shows that it actually occurs, on a basic level it accords with the intuitions of participants in the trial process.

> The suggestion that watching CSI might raise juror standards is consistent with empirical findings in other areas of legal psychology. There are large research literatures in the field supporting the argument that the mass media presentation of crime could produce a CSI effect of some kind. These literatures suggest that media presentations of background material shape juror verdicts in specific cases. Further, these effects occur even when people are instructed not to take account of the background material. Hence, it is entirely plausible that watching CSI shapes juror standards. While these studies fo-

---

4. State's October 17, 2006, reply memorandum p. 7.

cus on prior presentations of factual data about real crimes, there is evidence in the mass media literature that people do not adequately distinguish between the presentation of real crimes and the presentation of fictionalized crimes. These various mass media presentations of crime blur into general message that shapes the attitudes and beliefs of members of the public.

It is equally plausible, however, that CSI might have an effect opposite of that which has been suggested. CSI might aid the prosecution by lowering juror standards. The psychological literature on reactions to crime demonstrates that people want to see justice for victims. In the aid of this desire, standards for evidentiary sufficiency waver. The emotional desire to punish the criminal and restore the moral balance of the community can overwhelm the cognitive search for truth.

When jurors are motivated to identify and punish a wrongdoer, they can exaggerate the value of scientific evidence, viewing it as overly conclusive. People generally overvalue scientific evidence and engage in an active process of distortion to create justifications for decisions that they want to make. By providing increased legitimacy for scientific evidence, CSI may encourage people to make scientific evidence the focus of their justification efforts. And, of course, people can lower their standards as well. As an example, death-qualified juries do not distort the quality of the evidence but have a lower threshold to convict. This second mechanism for justification is also identified in studies of the impact of pretrial publicity. People who come into a trial biased have a lower threshold of evidence to establish guilt.

More specifically, when the desire for justice for the victim is greater than the desire for justice for the defendant, jurors may engage in the type of justifications that would lead to a reverse CSI effect-raising the perceived probative value of the evidence and increasing the likelihood of conviction. For example, when an innocent victim is harmed by a remorseless perpetrator of dubious character, we should expect to see these motivations come into play.

Finally, this Review suggests that there are alternative explanations for the allegedly increasing acquittal rate that has led to speculation about a possible CSI effect. First, juries may have increased sympathy for defendants. Second, juries may simple be less likely to convict than people with legal training and court experience expect them to be. Third, as a public's trust and confidence in the courts and the law decline, jurors may be increasingly skeptical of, and less inclined to defer to, the arguments of legal authorities. To the degree that any of these three alternative explanations is correct, there may be an increase in acquittals that is not linked to watching CSI. The effect may exist, but it may not be a CSI effect.[5]

The second author casting doubt on whether there is a "CSI Effect" is Dr. Kimberlianne Podlas. She is an assistant professor of Media Law Department of Broadcasting Cinema, UNC Greensboro. Her conclusion is succinct:

Although the media warns that a "CSI Effect" is seducing jurors into legally-unjustifiable "not guilty" verdicts and unwarranted demands for proof of guilt

5. "Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction." 115 Yale L.J. 1050, 1083–85.

beyond any and all doubt, the empirical results here suggest otherwise. Indeed, the data strongly denies the existence of any negative effect of *CSI*, it is to exalt the infallibility of forensic evidence, favor the prosecution, or pre-dispose jurors toward findings of guilt.

Unfortunately, notwithstanding the evidence disputing a "CSI Effect," if the public, the media, and the legal system do not accept or learn of this "proof," accusations of the "CSI Effect" will continue. Ultimately, much like the unfounded tort crisis, *CSI* horror stories of justice denied may drive legal "reforms" when no reforms are needed or cause the issue to improperly enter trial arguments. Consequently, before the "CSI Effect" has time and media repetition to embed itself into the psyche of the public and members of the justice system, it should be exposed for what it is: nothing more than fiction.[6]

On the other side of this issue there is a study conducted by the Maricopa County (Phoenix) Arizona Attorney's Office. That office conducted a survey of 102 of its prosecutors who had major jury trial experience. This survey notes that prosecutors there can speak to jurors after trials (unlike Delaware). The survey's findings and conclusion included:

> This study found a significant CSI influence in Maricopa County juries. Indeed, the survey found a more pervasive influence in Maricopa County than in the Florida State survey. Although the verdicts have not yet noticeably changed from guilty to not guilty, prosecutors have had to take more and more preemptive steps to divert juries from reliance on television-style expectations. As forensic programs continue to grow

in popularity, those steps may soon be inadequate.

\* \* \* \* \* \*

In Maricopa County, 38 percent of prosecutors believed they had at least one trial which resulted in either an acquittal or hung jury when forensic evidence was not available to corroborate testimony that should have been sufficient by itself to sustain a conviction.

Unlike the Florida state study, where prosecutors rarely meet with jurors after the verdict, Maricopa County prosecutors get their feedback directly from the source, with 94 percent of prosecutors having talked to jurors after a trial, and 64 percent of them "usually" talking to jurors. Obviously, prosecutors can obtain a better understanding of the CSI effect on juries by speaking to jurors after the trial. This access to real jurors in Maricopa County provides more direct and more reliable conclusions about the reasoning and expectations of jurors.

\* \* \* \* \* \*

Jurors often ask questions about evidence using terms or language not used at trial, like "mitochondrial DNA," "latent prints," "trace evidence," or "ballistics." Maricopa County prosecutors respond that this happens in 40 percent of their cases. Of greater concern is that 72 percent of prosecutors suspect that jurors who may have "expertise" gained from reviewing forensic crime television shows unduly influence other jurors who do not watch the shows.[7]

The Maricopa County Attorney's report refers to an earlier study out of Florida State University. That study reviewed surveys of 53 prosecutors and defense at-

---

6. Kimberlianne Podlas, *"The CSI Effect": Exposing the Media Myth,"* 16 Fordham Intell. Prop. Media & Ent., L.J. 429, 465 (2006).

7. "CSI: Maricopa County. The CSI Effect and its Real–Life Impact on Justice." June 30, 2005, pp 5, 6, and 7.

torneys to see if any of them had altered their trial preparation and tactics as a result of programs like CSI. Results of the surveys and conclusions include:

Every assistant state attorney and the majority of defense lawyers (79%) felt forensic crime dramas create unrealistic expectations of the court by the public.

\* \* \* \* \* \*

A little more than half of the public defenders (59%) and private attorneys (67%) felt forensic crime dramas create unrealistic expectations.

\* \* \* \* \* \*

By increasing an interest in forensic evidence where such evidence might be perceivable as lacking, defense attorneys may exaggerate the importance of forensic evidence or testing to benefit their clients' case. To get at these issues, attorneys were specifically asked the following four questions:

1. If defense attorneys have increased their general interest in forensic evidence.
2. If defense lawyers seem to draw attention to a lack of forensic evidence, no matter the amount of evidence presented, to jurors.
3. If defense attorneys draw attention to law enforcement agencies not submitting items for forensic testing, no matter the item's relevance to the case.
4. If defense lawyers have increased jurors' attention to a lack of forensic testing on items that would not likely prove the innocence or guilty of the accused.

\* \* \* \* \* \*

For each of the four questions, more attorneys sensed a slight increase in defense lawyers' interest than a significant increase. Only 17% of the attorneys reported a significant increase in defense attorneys pointing out to jurors the lack of forensic testing of items that likely would not prove the guilt of a defendant. In contrast, at least 28% reported a significant increase for defense attorneys general interest in forensic evidence, defense attorneys drawing attention to a lack of forensic evidence, defense lawyers emphasizing police not submitting items for forensic testing and defense attorneys pointing out a lack of forensic testing of an item that likely would not benefit their case if tested.

\* \* \* \* \* \*

When questioned about if they had observed an acquittal where the attorney suspected felt sufficient evidence existed but no forensic evidence was presented during the course of a trial, almost half (49%) of the respondents reported observing between one and five acquittals in the past five years where sufficient evidence existed in their opinion, but forensic evidence was not presented during the trial. Compared with defense attorneys, prosecutors were more suspicious of jury verdicts when forensic evidence was not presented.

\* \* \* \* \* \*

Approximately half of the defense attorneys and prosecutors felt at least one, but less than five, innocent verdicts were reached by a jury when forensic evidence was not presented during the course of the trial but sufficient nonforensic evidence was available.

\* \* \* \* \* \*

Of the findings of this study, the fact that a high number of attorneys have seen cases in which persons were found innocent, based largely on the lack of forensic evidence when sufficient circumstantial or testimonial evidence existed, is the most significant. The results suggest that at least some defendants have been acquitted when the prosecution did not have forensic

evidence to present during the course of a trial.[8]

The divergence of conclusions in these four articles is interesting in that the academics saw no basis for the "Effect" but experienced attorneys handling criminal jury trials did. The divergence is particularly notable in Phoenix, because the prosecutors spoke to jurors. Of course, the obvious prosecutorial bias or spin has to be accounted for.[9]

The phenomenon of the so-called "CSI Effect" has crept into Delaware jurisprudence. In *Boatswain v. State,*[10] the Supreme Court found improper a prosecutor's closing argument since it denigrated the standard of beyond a reasonable doubt:

> Assertions that discredit standards of proof as perceived on television, without more, do not alter the State's actual evidentiary burden. The procedures employed in fictionalized prosecutions, after all, are irrelevant to those utilized in a real court case. But statements that trivialize the actual constitutional standard by comparing it to a purportedly unnecessarily burdensome "television" standard may leave jurors with the impression that the State's burden of proof is pinned to either an abundance or dearth of a specific type of evidence.[11]

Subsequently, in *Mathis v. State*[12] the Supreme Court addressed another prosecutorial remark which also referenced CSI:

The next comment to which Mathis objects for the first time on appeal also occurred during the State's opening statement. After briefly reviewing the evidence the State intended to present, the prosecutor reminded the jury "Now, keep in mind when you're listening to the testimony from the witness stand this is not CSI Miami, it's not Law and Order. Nobody involved in this case, no one in this room is an actor. These are real people." Mathis claims that reminding the jurors of their role sets up a "television expectation" that trivializes the constitutional reasonable doubt standard. We disagree. This Court has previously addressed an argument referring to television shows in *Boatswain v. State*. (footnote omitted) Unlike the closing remarks in *Boatswain*, however, the prosecutor's statements here do not mislead the jury into any confusion over the State's burden of proof or trivialize or disparage the Constitutional standard of reasonable doubt. The opening statement only reminded the jury that this case was about real people, not actors.[13]

In *Mathis*, the Supreme Court found the prosecutor's remark did not trivialize the burden of proof beyond a reasonable doubt.

The State's "CSI Effect" argument has merit in two respects. First, this Judge in a number of trials in the last several years or so has witnessed defendants increasingly taking advantage of the "CSI Effect"

---

8. "Forensics in the media: Have attorneys reacted to the growing popularity of forensic crime dramas?" Michael. Watkins, Florida State University, August 3, 2004, pp 61, 69, 70, 73, and 76.

9. Perhaps a much better way of measurement would be to carefully select 50 cases in several areas of the country, select two juries for each case—who would believe they are in a *real* trial to avoid skewered results from "mock" jurors—and have one trial with forensic evidence and one without. There

would have to be far more involved in setting the test parameters, such as, whether there should be *voir dire* on the "CSI Effect," along with much else that would have to be considered.

10. 2005 WL 1000565 (Del.).

11. *Id.* at * 2.

12. 2006 WL 2434741 (Del).

13. *Id.* at *4.

phenomenon. They are aware of the phenomenon and are, correctly and appropriately, taking advantage of it by asking witnesses about tests they know were not conducted and contending in closing argument that the failure to test raises reasonable doubt. They are taking appropriate advantage of a different kind of proof expectations with which some jurors come into the courthouse in the last several years as a result of these programs. It would be naive not to recognize and acknowledge all of this. This does *not* mean the Court finds that there is a "CSI Effect" but, in fact, it means that there is enough of a possibility of it that it cannot be ignored.

The second factor in the State's argument is that prosecutors are caught in a "Catch 22" conundrum. If they produce no record that scientific tests were sought, they are subject to criticism and risk of verdict reversal if they, nevertheless, remark about the "CSI Effect".[14] And then, if there were tests which were inconclusive but again do not introduce evidence that the tests were even conducted, the State's case is exposed to the argument that not enough was done. Prosecutors must be extraordinarily careful not to denigrate or disparage their role or the burden of proof placed on them. Nor are they to denigrate, minimize, or disparage the meaning of reasonable doubt. This can be a fine

line. To avoid these traps, prosecutors now are almost required to engage in, shall we say, "defensive prosecution." It is like medical negligence cases where one wonders why physicians perform so many tests, some or many unnecessary, i.e., "defensive medicine."

The Court finds no harm in allowing such inconclusive evidence, as a general rule, in this case. First, it was not unusual in criminal cases, prior to any CSI show, for evidence to be introduced at the *defense* request that there was no fingerprints or there was no ballistics match or hair match, etc. In this case, however, the defense is seeking to exclude that very kind of evidence.

But, second, consistent with its burden of proof, the State should be allowed to show, up to a point, the "exhaustiveness" of its investigation. This is true even if the result of scientific testing was inconclusive. To be able to do this is, perhaps, even more important in a murder case.

### IV. Applicable Standards

Admission of expert testimony is governed by Delaware Rules of Evidence 702.[15] With a minor exception, D.R.E. 702 is now identical to Federal Rules of Evidence 702.[16] The identity in language is important because in *Daubert* the United States Supreme Court set out an interpretation of F.R.E. 702 that substantively

---

**14.** *Boatswain, Supra* p. 13.

**15.** If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. D.R.E. 702

Prior to December 31, 2000, D.R.E. 702 read:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

The 2000 amendment was to make the federal and state rules be the same and it now reads as indicated above.

**16.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

changed the ground rules for the admission of scientific expert testimony.[17] Those new ground rules were extended to all scientific technical and specialized matters in *Kumho Tire Co. v. Carmichael.*[18] In *M.G. Bancorporation, Inc. v. Le Beau,*[19] the Delaware Supreme Court adopted the *Daubert* and *Kumho* interpretations of F.R.E. 702 as how D.R.E. was to be interpreted and applied. Delaware determined it would follow the federal system and test D.R.E. 702 by the *Daubert* factors, rather than the *Frye*[20] factors.[21]

## A

### Daubert

The *Daubert* inquiry focused on whether the proposed expert testimony is tied to the facts of a particular case.[22] *Daubert* states that F.R.E. 702 spoke to and governed the issue of expert testimony,[23] in that it clearly contemplated "some degree

of regulation of the subjects and theories about which an expert may testify."[24] *Daubert* found the term "knowledge" as used in Rule 702 involved more than unsupported or subjective belief and applied "to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."[25] The Supreme Court said:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation-*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.[26]

■ Under *Daubert,* the trial judge is to make certain the expert testimony admitted is both reliable and relevant.[27] To

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. F.R.E. 702.

**17.** 509 U.S. at 589–97, 113 S.Ct. at 2795–98, 125 L.Ed.2d at 480–84 (1993).

**18.** 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238, 251 (1999).

**19.** "Although this Court is not bound by the United States Supreme Court's interpretation of comparable federal rules of procedure or evidence, we hereby adopt the holdings of *Daubert* and *Carmichael* as the correct interpretation of Delaware Rule of Evidence 702." 737 A.2d 513, 522 (Del.1999). D.R.E. 702 was amended *after* this decision to, in fact, make the state rule read identically to the federal rule.

**20.** *Frye v. United States,* 293 F. 1013 (C.A.D.C. 1923).

**21.** "Thus, in Delaware, scientific evidence, rather than being governed by *Frye,* must

satisfy the pertinent Delaware Rules of Evidence concerning the admission of scientific testimony or evidence. (citation omitted.) For *scientific evidence or testimony to be admissible* under the Federal Rules of Evidence, a trial court must also find the evidence sought to be admitted relevant and reliable. (citation omitted.) The Delaware Rules of Evidence are no different." *Nelson,* 628 A.2d at 74 (Del.1993).

**22.** *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796, 125 L.Ed.2d at 481.

**23.** *Id.,* 509 U.S. at 588, 113 S.Ct. at 2794, 125 L.Ed.2d at 480.

**24.** *Id.,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480.

**25.** *Id.,* 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481 (quoting *Webster's Third New International Dictionary* 1252 (1986)).

**26.** *Id.,* 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481.

**27.** *Id.,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480.

make that determination, the trial judge must first determine:

> whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue (footnote omitted). This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.[28]

 *Daubert* stated that the inquiry is to be flexible based solely on principles and methodology.[29] In determining whether the expert testimony is reliable and relevant, the trial judge is to be mindful of other applicable procedural rules as well as: (1) whether the theory or technique can be or has been tested; (2) whether the theory of technique has been subjected to peer review and publication; (3) in the case of a particular scientific technique, the known or potential rate of error; and (4) determination of a particular degree of acceptance within that community.[30] However, the Court purposefully did not set out a definite checklist or test.[31] The *Daubert* Court concluded that "[p]ertinent evidence based on scientifically valid principles will satisfy" the demands "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." [32]

## B
## Kumho

In *Kumho*, the Court determined that the judge's role as gatekeeper as set forth in *Daubert* was applicable not only to scientific testimony but to all expert testimony. Finding there was no relevant distinction made between scientific, technical or other specialized knowledge, the Court held F.R.E. 702 applied its reliability standard to all scientific, technical and other specialized matters within its scope as there was no evidentiary rationale to limit the *Daubert* gatekeeping role to only scientific knowledge.[33]

The Court stated that a trial judge *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.[34] As the *Daubert* test of reliability is "flexible," it did not necessarily or exclusively apply to all experts or in every case according to *Kumho* as "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." [35] Thus, the Court ruled that:

> [t]he trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.[36]

---

**28.** *Id.,* 509 U.S. at 592–93, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.

**29.** *Id.,* 509 U.S. at 595, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.

**30.** *Id.,* 509 U.S. at 593–4, 113 S.Ct. at 2797, 125 L.Ed.2d at 482–83.

**31.** *Id.,* 509 U.S. at 593, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.

**32.** *Id.,* 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485.

**33.** *Kumho,* 526 U.S. at 148, 119 S.Ct. at 1174, 143 L.Ed.2d at 250.

**34.** *Id.,* 526 U.S. at 141, 119 S.Ct. at 1171, 143 L.Ed.2d at 246.

**35.** *Id.,* 526 U.S. at 141–42, 119 S.Ct. at 1171, 143 L.Ed.2d at 246.

**36.** *Id.,* 526 U.S. at 152, 119 S.Ct. at 1176, 143 L.Ed.2d at 252–53. (emphasis in original).

## C.

### Admissibility of Expert Testimony in Delaware

■ In Delaware, scientific or technical evidence must satisfy the pertinent Delaware Rules of Evidence concerning the admission of scientific testimony or evidence.[37] Relevance is determined by examination of the purpose for which the evidence is offered.[38] That purpose must be of consequence to the case.[39] The decision to admit or not admit the expert's report, opinion and testimony is within the sound discretion of the judge.[40] As in *Daubert* and *Kumho*, this Court has stated previously the trial judge is to act as a "gatekeeper" over the proffered evidence.[41] Any testimony relating solely to generalities is irrelevant and therefore inadmissible under D.R.E. 402.[42]

Delaware has approved a five-part test to determine the admissibility of expert testimony, be it scientific or technical.[43] To satisfy this test, the trial judge must determine if: 1) the witness is qualified as an expert by skill, knowledge, experience, training or education (D.R.E.702); 2) the evidence is relevant, reliable and otherwise admissible (D.R.E. 401 and 402); 3) the opinion of the witness is based upon information reasonably relied upon by experts in the particular field (D.R.E.703); 4) the witness' testimony will assist the trier of fact to understand the evidence or to determine a fact in issue (D.R.E.702); and 5) the witness' testimony will not create unfair prejudice, confuse or mislead the jury (D.R.E.403).[44] This list is not a definitive test or checklist but contains factors to be tied to the particular case which "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." [45]

The State, as the party seeking to introduce the expert testimony, bears the burden of establishing its admissibility by the preponderance of the evidence.[46] Each proffer of testimony and its related evidence here at issue will be considered separately to determine if it is admissible as relevant and reliable. In order to determine whether the requisite inquiry is satisfied, the Court must look at the steps set forth in *Eskin* and *Nelson* and "examine whether there is a sufficient methodological foundation for the experts to give their opinion to the jury." [47]

The Court will consider each motion *in limine* separately under *Daubert* and D.R.E. 401, 402, 403, 702 and 703. The Court must look to whether the testimony, evidence, opinions and reports are relevant and will assist the trier of fact to determine fact at issue or whether it will potentially be confusing, misleading or a waste of time. Thus, the question before the Court is whether the evidence, reports,

**37.** *Nelson*, 628 A.2d at 74.

**38.** *Register v. Wilmington Medical Center, Inc.*, 377 A.2d 8, 10 (Del.1977).

**39.** *Farmer v. State*, 698 A.2d 946, 948 (Del. 1997).

**40.** *Lampkins v. State*, 465 A.2d 785, 790 (Del. 1983).

**41.** *Minner v. American Mortgage & Guaranty Company*, 791 A.2d 826, 843 (Del.Super.2000).

**42.** *McKinney v. State*, 466 A.2d 356, 359 (Del. 1983).

**43.** *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del.2006).

**44.** *Eskin v. Carden*, 842 A.2d 1222, 1227 (Del. 2004); *Nelson v. State*, 628 A.2d at 74.

**45.** *Kumho*, 526 U.S. at 150, 119 S.Ct. at 1175, 143 L.Ed.2d at 251–52.

**46.** *Bowen*, 906 A.2d at 795.

**47.** *Minner*, 791 A.2d at 847.

opinions and testimony where the result is inconclusive or exculpatory are relevant to the proof of the elements of the alleged crimes or relevant to the State's burden of proof. If they are not relevant to the proof of the elements of the alleged crimes, they are not admissible.[48]

## V. Discussion

Once Cooke indicated to the Court that he was satisfied with the qualifications of most of the experts and withdrew that part of his objections to their proffered testimony, the focus of the November 9th *"Daubert"* hearing narrowed. His withdrawal of his qualification objection neither obviates the State's need to establish qualification and foundation at trial nor cancels Cooke's right to *voir dire* or make other appropriate objections.

The narrowed focus of the hearing, however, still left open Cooke's relevancy objection to the subject areas of those experts whose expertise he no longer challenged. The reduced-scale hearing involved testimony of two persons, the handwriting and voice identification experts.

The Court will now review the status of each of the ten areas of scientific or technical evidence covered by Cooke's motions *in limine.*

### A

### DNA Prediction Analysis

■ As indicated earlier,[49] the State is not seeking to introduce this evidence. The objections which Cooke raised to this evidence are, therefore, moot.

### B

### Video Enhancement Analysis

In the early morning hours of April 30, 2005, someone attempted to use the MAC/

ATM card of Amalia Caudra at a Wilmington Trust Branch in the Newark Area. This attempt was captured on a somewhat grainy videotape An intruder had entered her house several hours earlier and, while there, took her MAC card. Cooke has been indicted for burglary and robbery in relation to this incident.

The person who appears in the video never shows a face. The State submitted the bank videotape to Grant Fredericks. He enhanced the video in an effort to clarify the image. Mr. Fredericks titles himself as a "Forensic Video Analyst." He has opined about certain matters in the enhanced video, such as the person's probable height, the clothing and the shoes worn.

The State supplied Grant's CV to the defense. He is located in Seattle, Washington. The Court, after reading his report, has preliminarily determined that: (1) video enhancement is a science or technique with which it is unfamiliar, (2) the technique or expertise needs amplification, and (3) his opinions and technique need further exploration. Based on these three factors and Grant's location in Seattle, the Court determined there will be no pre-trial hearing on Grant's expertise, the subject matter of his analysis or its admissibility. The Court will interrupt the trial to conduct the *"Daubert"* hearing and will postpone any rulings, beyond these preliminary ones, until that hearing is concluded.

### C

### Trace Evidence (Hair Analysis)

■ The person who conducted this exam or analysis was Amy Michaud. She works for the Bureau of Alcohol, Tobacco and Firearms (ATF). She was asked to examine an iron with a broken electrical

---

48. *State v. Kang,* 2002 WL 1587852 (Del.Super.), at *4.

49. *Supra,* p. 2.

cord, a broken cord and plug, a box cutter and a steak knife. Cooke has now reviewed the examiner's CV. He has informed the Court during the November 9th hearing that he no longer has an objection to her qualifications. He maintained, however, his relevance objection.

First, as to the box cutter and steak knife, nothing of any evidentiary value was found. Second, as to the iron and cord, some dark red head hairs were found on the broken end of the cord and some textile fibers were found on the cord and the iron. There is no evidence linking Cooke to any of this evidence. To counter Cooke's relevancy objection, the State's argues that it wants to portray to the jury, despite no probative result arising from this examination, that its investigation was thorough or to put it another way, the "CSI Effect." Whether "CSI Effect" or showing thoroughness, the State should be able to present this test result.

As to this evidence, subject to meeting all appropriate threshold tests for examination methods and the like under the rules evidence and *Nelson*,[50] the Court currently finds no reason to rule it inadmissable. The trier of fact will be assisted in knowing this test result. These same items underwent additional examination, and since the Court is ruling that evidence admissible, it is less confusing to the jury if both are admitted, though each has its own merits for admissibility.

## D

### Toolmark Evidence

■ Related to the hair trace evidence is an analysis at ATF of the same four items: the iron, the broken cord, the box cutter, and the knife. The brief report of the examiner indicates that the cord at-tached to the iron and the unplugged cord were torn apart by force.

Cooke has indicated to the Court that, after examining the CV for the toolmark examiner, Gregory Klees, he no longer objects to the examiner's qualifications. But the defendant maintains his objection about the relevance of his testimony.

There is some obvious difference between this analysis and the trace (hair) evidence above. Here the examiner opines that the two parts of the cord were torn apart with force. Under the circumstances of this case, the murder victim apparently being tied up,[51] there is some probative value to these two objects in their torn condition.

But again, there is permissible value for the State, in the presentation of its case, to show one more lead it followed and one more test it ran. The reasons discussed earlier regarding the trace evidence apply here, too. The Court believes the trier of fact—the jury—would be assisted in knowing of this evidence. The defendant's objection, is for now, overruled; his right to *voir dire*, of course, remains.

## E

### Hair Comparison Analysis

■ Various hair samples, including Bonistall's, the defendant's, and another alleged victim (Caudra) were submitted to the Delaware State Police Crime Lab.

The examiner found hair samples from Bonistall to be microscopically similar to hairs found in her left hand, from shirts used to gag and strangle her, hair on other items, hair from the bathroom floor, and from a sweatshirt. While samples of Cooke's head and pubic hairs were submit-

---

**50.** *Supra* p. 4.

**51.** The Court has an insufficient record before it to say what role exactly either of these objects have in the totality of what went on in the victim's apartment.

ted for analysis, none were found in the materials submitted from the murder victim's apartment. Nor were any of his hair samples linked in any way to the April 30th incident at the Caudra residence.

Cooke has now reviewed the examiner's CV (Juliann Willey) and withdraws his objection to her qualifications. He maintains his relevance objection.

Hair comparisons have been accepted matters of evidence in murder cases [52] and in robbery cases.[53] The absence of Cooke's hair from any of the crime scenes can, of course, create reasonable doubt.[54] Since the State has to prove Cooke guilty of all the charges, even those to which he is tendering a plea of guilty, but mentally ill, the hair analysis has probative value. First, its probative value is the same in connection with the so-called "CSI Effect" discussed earlier, particularly where rape is charged. To say jurors would expect in such a case to see no effort by the State to undertake hair comparison analysis would be naive. Second, the absence of potentially incriminating hair comparison makes Cooke's opposition curious. That, however, is his decision. Third, there was DNA recovered from the body of Bonistall which has been linked to Cooke.[55] It would be natural, therefore, to expect a concurrent effort to test for the presence of hairs.

The analytical report here, as is the case with the other reports, prompts a recitation of language in the case of *Ayres v. State*:

Here, the Trial Judge concluded that the report's findings and conclusions required explanation to be understandable.

Without such an explanation to from a qualified witness, the Court concluded that it would be "very easy for laymen to draw inaccurate inferences." On that basis, the Court ruled the report inadmissible.

The report, standing alone, clearly constituted hearsay evidence. While the report contained three negative findings that were favorable to defendant, (footnote omitted) other portions of the report were found by the Trial Judge to require explanation. (Tests performed on human blood found on victim's panties were described simply as "inconclusive"; a cryptic distinction was made between "human" blood and "menstrual" blood; and "both similarities and differences" were noted in the analysis of defendant's pubic hair samples taken from the bedsheets.) Thus, notwithstanding counsel's willingness to stipulate the report into evidence, we cannot conclude that the Court abused its discretion in not admitting the report, for the reasons stated above. Defendant's analogy of the report to a recorded statement of an eyewitness to a crime is inapposite.[56]

On balance, therefore, the Court believes that the hair analysis evidence would assist the jury. The defendant's objection in this regard is overruled at this point. His right to conduct *voir dire* remains.

### F

### Fingerprint Analysis

 Numerous items were given to the Delaware State Police for fingerprint com-

---

52. *Parson v. State*, 222 A.2d 326, 331 (Del. 1966).

53. *Buckingham v. State*, 482 A.2d 327, 330 (Del.1984).

54. *Deberry v. State*, 457 A.2d 744, 751, n. 5 (Del.1983).

55. This evidence was revealed at the "proof positive" hearing held in this case.

56. 436 A.2d 800, 802 (Del.1981).

parison with known prints of Cooke. The examiner was Rodney Hegman. The defendant has reviewed his CV and has withdrawn his objection concerning his qualifications. But, because no linking comparison was found between any of his known prints and any prints of unknown origin, Cooke objects on relevancy grounds. He claims no testimony here which will assist the jury.

Fingerprint analysis has also long been recognized by the courts as a sound method for making reliable identifications.[57] Fingerprint comparison testimony has a long history of admissibility in the courts of this country.[58] Such analysis has been tested and proven to be a reliable science over decades for judicial purposes with established principles and scientific methods approved in the field.[59] It is a theory that can be and has been tested with numerous studies supporting the conclusion that fingerprints are unique.[60] Substantial peer review, publication, cross-examination and professional training have provided opportunities to examine fingerprint analysis and establish relevant standards.[61]

Without excessive repetition, many of the same comments about other evidence apply here, too. Fingerprint evidence is among the oldest forms of scientific criminalistic evidence. To say juries expect it, is a gross understatement. To say that they would expect an effort to be made to have fingerprint analysis attempted in the era of "CSI Effect" would also for a gross understatement.

For sure, juries are instructed to decide the case on the evidence presented, but perforce, in this atmosphere, juries sometimes decide cases on "evidence" not introduced, such as, scientific analysis not sought or done. To believe otherwise is folly. Juries are also told not to speculate, and to reduce the risk of that happening, potential areas of speculation should be minimized.

The Court finds the evidence of seeking fingerprint comparison and the negative results to be of sufficient value to the jury in the totality of this case that it is admissible. Again, the defendant's right for *voir dire* is preserved even if his relevancy objection (for now) is overruled.

### G

### Voice Identification

■ FBI examiner, Hirotaka Nakasone, compared three different telephone calls from an unknown or questioned voice, one probably being a 911 call made to the Newark Police (which Cooke's girlfriend has said was made by him) to various known samples of Cooke's voice.[62] The findings he made are:

An aural examination of specimen K2 revealed that it was recorded using a different recording channel and it is of poor recording quality. Therefore, no comparisons were conducted using specimen K2.

An aural examination of specimen K3, K4, K5, and K6 revealed that they are not verbatim voice samples of the tele-

**57.** *United States v. Crisp*, 324 F.3d 261, 265 (4th Cir.2003).

**58.** *Id.*, 324 F.3d at 271.

**59.** *United States v. Joseph*, 2001 WL 515213. (E.D.La.), at *1.

**60.** *State v. Cole*, 2002 WL 1397452. (Del.Super.), at *1.

**61.** *Id.*

**62.** His report does not identify what unknown voice recordings he was comparing to known samples. Since the 911 call is significant, the Court assumes it was one of the "unknown" recordings he compared.

phone calls on specimen Q1. Therefore, no comparisons were conducted using specimens K3, K4, K5, or K6.

Speaker identification by the spectrographic method requires that the same words and phrases be compared between the unknown and known speakers. Therefore, voice exemplars should contain the same wording and recording channel used by the unknown speaker. Voice identification by the spectrographic method is not considered a positive means of speaker identification and the results of such examinations are furnished for investigative guidance only.[63]

As with the other examiners, Cooke has reviewed Nakasone's CV and has withdrawn his objection on qualifications. He maintains his relevancy objection.

The analysis of that objection differs from the other discussion of the scientific or technical evidence. First, based on representations made by the State at the November 1st office conference, this is a newer science. Second, it is a less reliable means of comparison. The quoted portions of the report offer partial confirmation, although like circumstances where fingerprints may not be left, circumstances exist for why voice comparisons cannot be made.

But Hollywood appears to be ahead of science. Television programs and movies show voice identification being made. The concern is that, as another example of the "CSI Effect," potential jurors are exposed to this heightened expectation of what they believe prosecutors should produce to meet the burden of proof.

The Court believes Cooke's relevance and reliability objections based on D.R.E.

702 and 401 are well taken as to this evidence.

Nakasone was unable to make any voice comparisons. That may have been due, in part, to the poor quality or inadequacies of the recordings given to him. Coupled with that was the State's refreshingly candid statement at the office conference about the status of this developing science. All of this means even evidence of even seeking voice comparison or identification is inadmissable *in this trial.* The Court is not ruling on voice identification evidence beyond this trial.

Because of CSI, other TV programs and movies, there is a risk the jurors in this case may speculate why a voice comparison analysis was not sought and/or done. That risk has to be accepted. The Court, nevertheless, accepts that the risk may even be greater due to the other inconclusive evidence the Court in this ruling declares *is* admissible. But there are some helpful parallels to polygraph test results.

The results of polygraphs examinations are inadmissible.[64] To comment on them is also unprofessional.[65] While the science of "voice identification" may be more reliable, to allow even a reference to seeking it will create the risk of impermissible jury speculation in this *case.* This is *not* to say that the science may not be reliable enough in another case which does not have the technical impediments present here. Those impediments, primarily poor recording equipment, coupled with issues about the state of the science itself equate to the inadmissibility of anything being questioned or argued about the police

---

63. Federal Bureau of Investigation report dated August 23, 2005.

64. *Williams v. State,* 378 A.2d 117, 120 (Del. 1977); *Foraker v. State,* 394 A.2d 208, 213–14 (Del.1978).

65. *Hughes v. State,* 437 A.2d 559, 575–76 (Del.1981).

seeking or not seeking voice identification through testing and of the test results.

## H

### *Footwear Comparison*

■ When Cooke was arrested in June, 2005, he was wearing a pair of Safe Street boots. The police seized them. They, along with some other footwear, were sent to the FBI for analysis and comparison to partial footwear marks found on a notebook inside the living room of Bonistall's apartment near some sliding doors.

The FBI examiner was Michael Smith. Initially, Cooke raised an objection to his qualifications. After the State provided his counsel with a copy of his CV, that objection was withdrawn. As the witness' expertise issues has been resolved, the next issue is the relevance and reliability of his opinions. Smith's conclusion was:

> The patterned impression (labeled # 2) on the Q2 (notebook) item shares the same perimeter lug design as the Q8 and Q9 boots. However, due to the limited detail retained in this impression, no determination was made as to whether or not the Q8 or Q9 boot is the source of this impression.[66]

Without a detailed repetition of all the remaining grounds Cooke raised to this evidence, he raises the same ones he did to the specialized evidence discussed in this opinion.[67]

Because the Court believed Smith's report merited some clarification pre-trial, he became part of the *Daubert* hearing on November 9th. By agreement, he testified by telephone.[68] In most basic terms, Smith cannot say the shoe print on the

notebook came from Cooke's boots or did not come from his boots. The footwear print on the notebook had "perimeter shaped lugs." There were some similarities to Cooke's boots, but too general to conclude the impression originated from his boot(s). On the other hand, there is just enough of an impression on the notebook to be unable to *eliminate* Cooke's boots as the source.

The questioning at the hearing revealed that there are millions of potential boots which could have left the minimal "lug" impression seen on the notebook. Some would be of the same Safe Street brand and some of other brands. Safe Street boots are available at such national brand stores as Payless, Walmart, and Sears.

The State has again offered the "CSI Effect" as a reason for relevance. It also argues that the inability to exclude Cooke's boots as a source is relevant. Cooke counters that the inability to be more definitive and all the other matters, such as the millions of other boots as potential sources, general availability of such boots, negate any relevance. Further, he says the minimal connection and chance for so many other sources, raise issues of unfair prejudice or confusion.

The Court finds even Agent Smith's generalized conclusion is probative. The inability to rule out Cooke's boots as the source of the impression on the notebook found in Bonistall's apartment has some probative value. While slight, it must be viewed in full context of the evidence in the case, particularly that which has more connective value. If this were the sole evidence, this holding might be different, but the contextual and more complete rec-

---

66. Smith report dated October 20, 2005, at p. 2.

67. *Supra* pp. 4–5.

68. By further agreement, Smith's testimony was to be transcribed and sent to him. If okayed by him, he was to swear to it. It was transcribed and sent to him. He has sworn to it and it is now part of the record/docket.

ord known to the Court so far requires a view not in vacuum.[69] After all, each piece of evidence does not standing alone have to prove guilt beyond a reasonable doubt. Further, the Court sees no basis to say this evidence is potentially confusing or misleading.

Neither party has cited and the Court's own research has not revealed any Delaware case discussing footwear comparison evidence. There is, however, a Court of Appeals opinion helpful to the resolution of this objection. In that case, where the shoe print evidence was that it could have come from the defendant's shoes, albeit an apparent stronger linkage than here, the Court said:

> Allen first attacks the relevance of the expert testimony, arguing that Pitzen's (the expert) testimony had little value since his opinion was inconclusive. This argument will not carry the day, as an "expert need not have an opinion on the ultimate question to be resolved" to satisfy the relevance requirement. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000); *see also Walker[v. Soo Line Railroad Co.]*, 208 F.3d [581]at 587[ (7th Cir.2000) ].
>
> Allen also attacks the reliability of the expert evidence, arguing that (1) a layperson could have performed the visual comparison of Allen's shoe and the impression left in the cement, and (2) shoeprint identification is not a reliable methodology because it is not subject to peer review. Allen's arguments are belied by the testimony of two witnesses, Sandra Wiersema (a forensic examiner with the F.B.I.) and John Vanderkolk (manager of the Indiana State Police Laboratory), at the evidentiary hearing. The witnesses testified that accurate

comparison require a trained eye; the techniques for shoe-print identification are generally accepted in the forensic community; and the methodologies are subject to peer review. We are, therefore, unpersuaded by Allen's argument that the district court abused its discretion by admitting Pitzen's expert testimony regarding the shoe print evidence.[70]

This language also addresses the other criteria under *Daubert* and *Eskin* for the admissibility of this evidence. While not a definitive or exhaustive criteria, this Court sees no other factor which raises a concern about the admissibility of this evidence. Subject to any further pertinent new information later developed, Cooke's objection is overruled as to the footwear comparison on the notebook. Again he is still entitled to *voir dire* in the presence of the jury.

## I

### Fabric Impressions

 The State submitted to the FBI a notebook, some gloves and other material for fabric impression analysis. The examiner was Cary Orien. As with all the other experts, Cooke had initially challenged her qualifications. But, as he did with most of them, he has withdrawn that challenge after reviewing her CV.

That position leaves open for consideration the relevancy objection he raised about her testimony. Her report, which is written in the usual format of an examiner (no criticism intended), is somewhat unclear to the Court. Its contents supplemented by the parties' exchange of their positions on this report indicated that there was no evidence of value found.

---

69. The issues of the number of brands that could leave the impression, ·the number of stores in which sold go to weight not admissibility.

70. *United States v. Allen*, 390 F.3d 944, 949–50 (7th Cir.2004).

Further, unlike some of the other test results discussed earlier where Cooke could not be ruled out or in, the examiner found here nothing to "even" rule him in. The State, therefore, acknowledges the obvious that this test result is exculpatory.

With that status, the State contends, nevertheless, this evidence is relevant. Its argument is that it wants to show the jury the exhaustiveness of its investigation. It does not expressly assert the "CSI Effect," but that is the real thrust of its argument.

When the State made the same argument about other areas of scientific or technical evidence, it had two factors favoring admissibility. One was that some of the evidence was at least inconclusive in that Cooke, while he could not be ruled in as the source, he could not be ruled out either. Such evidence when reviewed in the totality of the State's evidence has probative value. Two, in a few cases, such as fingerprint comparisons, there was not even that equipoise. But seeking such analysis has been a traditional tool in trying to find evidence, and since Cooke suffers no prejudice in those instances, the State would if excluded. The reasons have been discussed.

Neither of these considerations apply here. This result is not in equipoise nor is the Court convinced that this kind of analysis is so generally expected by jurors that its exculpatory result is relevant. As to this evidence, therefore, Cooke's motion is granted. The Court acknowledges that there remains the issue of whether Cooke can question the witnesses or argue whether this kind of analysis was sought now that the Court has ruled this particular test result inadmissible. The Court is unaware if Cooke has a position on this point or, if he does, what it is.

## J

### Handwriting Comparison

Cooke faces charges involving three incidents. At the scenes where two of the three crimes are alleged to have occurred, there was printed hand writing on the walls. One scene is where Lindsey Bonistall was murdered. At her apartment, the investigation revealed these writings: [71]

"KKK"

"White power" written near "KKK."

"More bodies are going to be turnin up dead."

"We want are (sic) weed back. Give us are (sic) weed back."

The other scene, where the Harmon burglary is alleged, these printed words appeared:

"We'll be back."

"Don't mess with my men."

"I want my drug money."

These writings were compared by Georgia Carter of the Delaware State Police Crime Lab to known samples of Cooke's handwriting. The known samples came from various sources, such as, employment applications and other documents. Other known examples were ones Ms. Carter obtained from Cooke shortly after he was arrested and pursuant to a court order.

According to Carter's report, she reached the following conclusions about the comparisons involving the writings in Bonistall's apartment:

### RESULTS OF EXAMINATION

A close examination of the KNOWN hand printing of James E. Cooke to Q-1 through Q-7 revealed several individual hand printing characteristics similar. Also the same significant grammar error was present in the exemplar (dictated

---

71. There may be other misspellings or grammatical errors in the original writings which are not replicated in these quotes.

standard) and the QUESTIONED printing.

An exemplar was administered to Mr. Cooke and witnessed by this examiner on June 13, 2005 at Gander Hill Prison. The hand printing sample was practically illegible. It is this examiner's opinion that Mr. Cooke attempted to disguise and distort his natural hand printing style.

It is the examiner's opinion that there are strong indications that Mr. Cooke probably prepared Q-1 through Q-7.[72] As to the burglary matter at the residence of Cheryl Harmon:

**RESULTS OF EXAMINATION**

A close examination of the KNOWN hand printing of James E. Cooke to Q-1B through Q-3B revealed some general features in agreement. It is not possible to determine with any degree of certainty if Mr. Cooke did or did not prepare the QUESTIONED printing. However, because there are some general features in agreement, Mr. Cooke cannot totally be ruled out.[73]

 Cooke's initial motion to exclude Carter's testimony contained two basic objections. One, he challenged her qualifications. Two, he questioned her methods and whether those methods could reliably form the basis of her conclusions. With the exception of the video enhancement witness, Carter was the only other expert about whom Cooke maintained his qualification objection. Because of both of his objections and because the Court wanted some clarification of wording in her report, Carter appeared at the November 9th hearing.

Carter testified and explained her background. It includes being a forensic document examiner for 20 years, attending a Secret Service school on document examination, taking several forensic document courses, being qualified in the United States District Court in 1989 and, in the last 18 years, having testified 27 times in her expert capacity in various courts, including this one.

On *voir dire* from Cooke, she testified that she is the State Police's only document examiner, has no supervision from another examiner, neither she nor the State Police lab are accredited, that she has no manual or other documentation for her methodology. The *voir dire* also revealed there is a large element of subjectivity in her field.

At the conclusion of the State's and Cooke's preliminary questioning, the Court announced it was satisfied that Carter had the expertise to offer substantive testimony. Subsequent to the hearing, Cooke renewed his challenge to Carter's expertise, and to some degree the qualifications of the Delaware State Police crime lab. The Court has considered this renewed challenge and, with it, the remaining reasons Cooke initially raised to exclude her testimony. The tests to be used to determine admissibility are:

1. That the expert is qualified;
2. That the evidence offered is otherwise admissible, relevant and reliable;
3. That the basis for the opinion are those reasonably relied upon by experts in the field;
4. That the specialized knowledge being offered will assist the trier-of-fact to understand the evidence or to determine a fact in issue; and
5. That such evidence would not create unfair prejudice, confuse the issues, or mislead the jury.[74]

---

72. Georgia Carter report, July 1, 2005, p. 3.

73. Georgia Carter report, July 1, 2005, p. 3.

74. *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006).

The party, again here the State, wishing to introduce her expert testimony has the burden of showing its admissibility by a preponderance of the evidence.[75]

Carter's qualifications as an expert have been challenged in Superior Court on at least two prior occasions. One occasion was in a bench ruling which is referenced in *State v. Jones*, which is the second (known previous) occasion.[76] The qualifications which Carter offered in the November 9th hearing are recited in *Jones*. She had not appeared as an expert witness as often in April, 2003 as she has as of November, 2006.

The Court in *Jones*, as had the judge issuing the bench ruling, found Carter had the requisite knowledge, skill, experience and training to be qualified as an expert in document analysis. Keeping in mind that Carter has now been qualified as expert several more times since *Jones*, without knowing if she has been challenged on any of those additional intervening times, this Court finds her to be qualified for the reasons raised in Cooke's original motion and any he raised at the hearing.

Cooke, in a post-hearing additional motion, seeks to cast sufficient doubt on her expertise by raising other issues developed, but not fully argued, at the hearing. He notes Carter testified that she is unaware if theories of handwriting comparison have been tested or subjected to peer review, that she has no knowledge of the potential error rate of examiners and that there are no standards for making comparisons. He raises more criticisms than these, but those listed capture the essence of his challenge.

Handwriting comparison is beyond a lay person's general knowledge. As the Court in *Jones* said, echoing the earlier bench ruling in the other case, handwriting analysis is a special skill not a science. It, therefore, does not fit neatly into all the *Daubert/Kumho* holes of:

1. Whether a theory or technique has been tested;
2. Whether it has been subjected to peer review and publication.
3. Whether a technique had a high known or potential rate of error and whether there are standards controlling its operation; and
4. Whether the theory or technique enjoys general acceptance within relevant scientific community.[77]

The Court has re-examined Carter's qualifications as a result of Cooke's post-hearing renewed challenge. Most of his points were raised in his initial motion or developed at the hearing. The Court took into account all of these bases for his initial challenge when it ruled Carter qualified. Renewed reflection and any new bases to question Carter's qualifications do not alter this Court's view that she is qualified in this subject area to offer opinions to the jury. His objection about her qualifications is overruled.

 His second objection focused on the relevancy of her opinion regarding the source of the writings on the walls in Harmon's residence. Carter's hearing testimony provided more details about her conclusions in the Bonistall matter. Her testimony was the same as her report in the Harmon burglary: she could not reach a conclusion about whether the defendant was the author of the wall writings there. Nor, however, could she rule him out.

The relevancy issue arises from the inconclusive result she notes about the Harmon incident. Unlike some of the other

---

**75.** *Bowen*, 906 A.2d at 795.

**76.** 2003 WL 21519842 (Del.Super.).

**77.** *Bowen*, 906 A.2d at 794.

evidence discussed earlier where part of the tilt in favor of admissibility comes from the so-called "CSI Effect," the Court does not see that factor having a role with this proposed evidence.

The admissibility of Carter's conclusion about the Harmon wall writings starts with her opinion that Cooke cannot be ruled out as the author. But the admissibility analysis includes more. Carter opines that there is a "strong indication" that Cooke "probably prepared" the writings in Bonistall's apartment. In the May 2nd call to the Newark police, which Cooke's girlfriend says he made, he links the Harmon and Bonistall events. He uses words found in both sets of writings. There is more. Both crime scenes had writings and there is a similarity of some of the content. Coupled with being unable to rule Cooke out as the source of the Harmon writings and because of this interlinked evidence, Carter's opinions about the Harmon writings are admissible.

Naturally, of her much stronger opinion linking Cooke to the writings on the walls in Bonistall's apartment, relevancy is manifest. In her hearing testimony Carter offered more details about her conclusions and about the writings themselves, including that comparing printed words is harder, problems of comparison arising from the writing instrument probably used, i.e., a blue magic marker, etc. These details do not affect the relevance or admissibility of her testimony. They and others go to the weight the jury will have to assign to her conclusions.

When handwriting experts compare known to unknown writings, they are in part, relying upon information and techniques used by experts in their field. In going to school and taking the courses, as Carter has, they are using means of comparison which others in this field use. In short, there is no reason to find that Carter's methods do not employ or involve methods reasonably relied upon by experts in her field.

Carter's evidence is but one piece in the larger puzzle which will assist the jury in deciding the issues in the case. At the same time, her testimony will not create unfair prejudice, be confusing or be misleading to the jury. It must be viewed in the context of all of the evidence in this case. Subject to any unforeseen new issues, developed at trial, the Court finds the State has met its burden of meeting the first two objections to the admissibility of Carter's expertise and her testimony.

But Cooke has raised a third objection to Carter's possible testimony. It was raised after the hearing and briefing on it and has just concluded. He argues that the methods Carter used to obtain handwriting exemplars directly from Cooke amount to testimonial evidence which violates his right against self-incrimination. There are two parts to this claim of infringement. One is that she directed him to print by copying what already appeared on certain exemplars or to print what she dictated to him to put on blank pages. The second claim is that Carter dictated, in some instances, to Cooke what she wanted him to write and on these exemplars there was no prepared text to copy.

Both of Cooke's objections raise issues novel to Delaware jurisprudence. Further there is no United States Supreme Court decision directly addressing either issue nor is there such a decision from the Third Circuit or the District Court for Delaware. This is not to say that there are no helpful precedents from other courts; there are. But since the issues here are novel, are of a constitutional dimension and potentially affect the admissibility of Carter's opinions or create problems with her methodology, the Court deems it necessary to discuss these issues in some detail.

Carter went to the prison on June 13, 2005, where Cooke was being held shortly after his arrest. Over a period of about two hours, Carter obtained 52 exemplars from him. The session was videotaped, and all counsel and the Court have now examined it. Subsequent to viewing the tape, the Court asked for and has received and examined copies of the 52 exemplars Cooke provided to Carter at that session.

Examination of those exemplars puts them, generally, into four categories. The first group consists of exemplars where the page on which Cooke was to write already had the material he was to copy. Another set are those pages where Carter dictated to Cooke what she wanted him to write and there was no prepared text. The third consists of one page that does not neatly fit either of those categories. It is exemplar 49 where Carter asked Cooke to write the letter KKK, but she did not specify the style or whether it was to be in capital letters or non-capital letters. The fourth category is exemplar 52 which is freestyle and where she told Cooke he could write anything he wanted.

Cooke's Fifth Amendment claim encompasses two aspects. One is that his rights were infringed when he was told to print. The other involves being told what to write. The issues overlap at times because there are exemplars where Carter directs Cooke to print and there is prepared text on the page. At other times she instructs him to print what words she dictates to him.

The starting point are these exemplars where printed prepared text already appears. Those exemplars are 2, 3, 7, 11, 15, 19, 23, 27, 21, 25, 29, 43, 47, and 51. For example exemplar 2 is entitled "Miscellaneous Writing." [78] The twelve months of the year are listed (three lines, four months under each line). Carter directed Cooke to print the months above the corresponding pre-printed months. Despite that directive to print, Cooke wrote each month in cursive. A little later, he basically explains to her, after she remarks how he was writing out something, that he writes in cursive and does not print. Exemplar 3 has pre-printed across the top the letter A–H, all in capitals. Carter directed him to print the same letters and do so in capital form. A few of the letters he wrote out are more in cursive style but a few are closer to a printed style.

■ As noted, Carter also directed Cooke to print when she asked for exemplars of his writing and she dictated what he was to write. Leaving aside for the moment the dictation issue, the question is whether there is an infringement of Cooke's Fifth Amendment right against self-incrimination by telling him to print.

The analysis of that issue must start from the constitutional foundation of the taking and admissibility of handwriting exemplars. In *Gilbert v. California,*[79] the Supreme Court said that taking of exemplars did not violate the Fifth Amendment self-incrimination protection. It said a "mere" exemplar, "like the voice or body itself, is an identifying physical characteristic outside (the Amendment's) protection." [80] That holding and reasoning was re-affirmed in *United States v. Mara,*[81] where the Supreme Court said "there is no more expectation of privacy in the physical characteristics of a person's script." [82]

---

78. Exemplar 1 also is entitled "Miscellaneous Writing" which asks for his name, date of birth, place of birth, and address. Carter asked him to print that information.

79. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

80. 388 U.S. at 267, 87 S.Ct. at 1953, 18 L.Ed.2d at 1183.

81. 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

82. 410 U.S. at 21, 93 S.Ct. at 776, 35 L.Ed.2d at 103.

These pronouncements are the constitutional building blocks for the analysis of both of the current issues.

On the first issue of dictating *how* the pre-printed words or letters were to be written, there is scant helpful authority. The closest authority involves Timothy McVeigh. In *United States v. McVeigh,*[83] McVeigh was ordered to provide cursive handwriting exemplars. McVeigh claimed he had not used cursive writing in any public way in six years. He also stated that during those years, he almost exclusively printed. The court saw no violation of his Fifth Amendment right against self-incrimination in requiring McVeigh to give cursive samples. The basis for this holding was that the manner of lettering is a physical characteristic and not the product of a mental process.[84]

There are two Third Circuit opinions of partial value to the issue of whether Cooke could be directed to print letters, words, or phrases. The first is *United States v. Clifford.*[85] The defendant was alleged to have sent threatening letters which were printed in block style. The government had obtained cursive letters, supposedly written by him, that contained the same or similar spelling errors and abbreviations as in the threatening letters. He refused to acknowledge, however, that he had written the cursive letters. The District Court denied the government's request to have the defendant write similar letters in cursive to establish that he was the author of the cursive letters the government already had.

The Third Circuit reversed, finding no privilege existed and that the jury could see the misspellings and abbreviations in the threatening letters and compare them to the same or similar matters in the cursive letters which would be linked to him by the exemplars the government sought. The primary issue in *Clifford* was not constitutional, however, but one of whether a jury could evaluate those similarities on its own. The Third Circuit said it could and held the District Court erred when it said a jury could only weigh the similarities with the help of a forensic linguistics expert.

Of closer relationship to the issue at hand is *In re: Special Federal Grand Jury.*[86] A grand jury witness refused to provide "normal handwriting with a backward slant." Writing backhand was not the witness' claimed normal style. To do the exemplar in backhand would, the witness contended, violate his Fifth Amendment rights putting it this way:

The appellant argues, however, that under the facts and circumstances of this case, an additional tacit admission was inherent in the act of providing the sample. That admission was that the witness would choose to slant his handwriting at a certain angle when disguising it. He further argues that such an admission is testimonial for purposes of Fifth Amendment protection.[87]

The court said in response:

That the witness' name may be linked with backhand writing could not by itself implicate the witness in criminal conduct. Surely it is not illegal to disguise one's handwriting with a backward slant. The potential for incrimination would be that based on analysis of the *physical characteristics* of the handwriting exemplar the witness could be identified as the author of the relevant documents.

**83.** 896 F.Supp. 1549 (W.D.Okl.1995).

**84.** *Id.* at 1562.

**85.** 704 F.2d 86 (3rd Cir.1983).

**86.** 809 F.2d 1023 (3rd Cir.1987).

**87.** *Id.,* at 1026.

This potential exists to the same degree whether the sample is backhand or forehand. Thus, the minimal thought process involved in slanting one's handwriting is of no significance in transforming physical evidence into testimony.[88]

Also not directly related to the issue of directing Cooke to print but, nevertheless, helpful to resolving this issue is *Commonwealth v. Nadworny*[89] which considered whether directing a defendant to copy sentences with either his right or left hand violated any of his rights. The defendant was right handed and claimed to have to chose to write with his right hand violated his Fifth Amendment rights. The Court held it did not.

As to the exemplars where Carter told Cooke to print what was already on the page, therefore, the Court holds there is no violation of his Fifth Amendment privilege. First, what Carter wants Cooke to replicate is already on the page. Second, while the act of *choosing* to print or to write in cursive is slightly more than just the actual writing characteristics of a letter or word, the choice does rise to the level of a testimonial act. It does not impose an incriminating thought process. The Court's ruling applies to her directive to print all the same letters in capital style, to print in lower case, or even to print smaller.

The Court believes it is prudent to identify the specific exemplars covered by this part of its ruling:

# 1–where Cooke is asked to supply address, DOB, etc.

# 2–where Cooke was told to print 12 months already listed on the page.

# 3–where he was told to print in caps the capital letters appearing on that page (A—H).

# 7–where Carter told Cooke to print in capitals all the capital letters existing on that page (I—Q).

# 11–where Carter asked Cooke to copy the numbers as he saw them. That page has the numbers 1–9 and the words one—through various numbers. Cooke wrote in cursive the numbers when spelled out as words.

# 19–on this page there the letters a—h in small case. She asked Cooke to similarly do small letters. He wrote some in cursive capital style and repeated the small case letters in cursive style.

# 23–on this page the small case letters of I—q appear. She tells Cooke to print the letters as he sees them. All but q are in cursive.

# 27–on this page, also in small case, are the letters r—z. She asks him to copy and not cram together.

# 31–another page with pre-printed capital letters, A—H. Again he is asked to print, but he writes in cursive.

# 35–Carter directs Cooke to print the capital letters (I–Q) as he sees them. He writes in cursive.

# 39–the letters R—Z in caps appear on the page. The tape of his exemplar session, however, has a break in it and the Court does not know what Carter told Cooke to do. The letters are pre-printed.

# 43–the lower case letters a-h are pre-printed on this page. Carter told Cooke to print and to do so in small case, some are and some are not, which is probably why she repeated the instruction to do it in lower case.

# 47–the lower case letters, i-q are pre-printed on this page and he is told to copy.

---

88. *Id.*, at 1026–27. (emphasis in original)

89. 396 Mass. 342, 486 N.E.2d 675 (1985).

In each of the above instances, the letters or words which Carter tells Cooke to copy already appear on the page. All of the letters are in print format whether caps or lower case. Cooke, in effect, is directed to copy the letters or words as they appear. As stated, even though Carter told him to print, that act does not implicate Cooke's Fifth Amendment privilege against self-incrimination. As to these listed pages the Court finds no impediment to Carter's using them in her effort to determine if Cooke wrote on the walls in either the Bonistall apartment or the Harmon residence.

 The rulings that Cooke's Fifth Amendment privilege is not infringed by directing him to print when copying prepared words encompasses Carter's directive to print what she dictates. The same reasoning applies to this group of exemplars, too. To be clear what is not an infringement is telling Cooke he has to print and not write in cursive. But those exemplars where Carter dictated to Cooke *what* to write raise a substantively different constitutional issue. It is instructive not only to keep in mind the Supreme Court's opinions in *Gilbert* and *Mara* cited earlier, but to also to refer to several other Supreme Court decisions. Still, even with these decisions, that Court has not expressly addressed the issues raised with this second set of exemplars. Nor, again, to this Court's knowledge has any Delaware Court, the Third Circuit, or the United States District Court for Delaware opined in this discrete area.

To retrace a bit, the Fifth Amendment protection does not extend to obtaining blood samples.[90] As noted from *Gilbert*, which equated getting blood samples to

obtaining writing exemplars, the self-incrimination protection does not prevent requiring giving exemplars. Amplifying on that the Supreme Court in *Fisher v. United States* said:

> When an accused is required to submit a handwriting exemplar he admits his ability to write and impliedly asserts that the exemplar is his writing. But in common experience, the first would be a near truism and the latter self-evident. In any event, although the exemplar may be incriminating to the accused and although he is compelled to furnish it, his Fifth Amendment privilege is not violated because nothing he has said or done is deemed to be sufficiently testimonial for purposes of the privilege.[91]

This was *dicta* in *Fisher* but the constitutional principle is re-confirmed. A limit to there being no protection, however, became a little clearer in *Pennsylvania v. Muniz*.[92] *Muniz* is a DUI case, and the point where the protection is triggered arose in the context of an oral answer to a question, not a handwriting exemplar. But the decision provides guidance about where the protected testimonial privilege begins. Among the questions the police asked Muniz were his date of birth, current age, and the date of his sixth birthday. His delivery and content were incriminating, particularly as to his sixth birthday since he did not know the proper date. The Supreme Court found no protection in requiring answers to the first two questions. It found a self-incrimination infraction with the third question.

First, the Supreme Court, harking back to *Gilbert* said, "Had the suspect been asked to provide a writing sample of his

---

**90.** *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

**91.** 425 U.S. 391, 411, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39, 56 (1976).

**92.** 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

own composition, the content of the writing would have reflected his assertion of facts or beliefs and hence would have been testimonial...." [93]

As to the answering the sixth birthday question, the Court, holding the answer implicated Muniz's Fifth Amendment rights, said:

In contrast, the sixth birthday question in this case required a testimonial response. When Officer Hosterman asked Muniz if he knew the date of his sixth birthday and Muniz, for whatever reason, could not remember or calculate that date, he was confronted with the trilemma. By hypothesis, the inherently coercive environment created by the custodial interrogation precluded the option of remaining silent (citation omitted). Muniz was left with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not then believe to be accurate (an incorrect guess would be incriminating as well as untruthful). The content of his truthful answer supported an inference that his mental faculties were impaired, because his assertion (he did not know the date of his sixth birthday) was different from the assertion (he knew the date was (correct date)) that the trier of fact might reasonably have expected a lucid person to provide. Hence, the incriminating inference of impaired mental fac-

ulties stemmed, not just from the fact that Muniz slurred his response, but also from a testimonial aspect of that response. (footnote omitted). [94]

The Court in *Muniz* referred back to an earlier case, *Doe v. United States* [95] which discussed at length what may be included within testimonial evidence protected by the Fifth Amendment. "Doe" had been directed to sign a document authorizing foreign banks to disclose any records of his. The Court, in the end, found no protection in requiring him to do so. But it said:

An examination of the Court's application of these principles in other cases indicates the Court's recognition that, in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. (footnote omitted) Only then is a person compelled to be a "witness" against himself.

\* \* \* \* \* \*

These policies are served when the privilege is asserted to spare the accused form having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government. [96]

These Supreme Court decisions provide helpful foundational guidance.

93. *Id.,* at 598, 110 S.Ct. at 2648, 110 L.Ed.2d at 550.

94. *Id.,* at 598–99 110 S.Ct. at 2649, 110 L.Ed.2d at 550.

95. 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988).

96. *Doe,* 487 U.S. at 209–10, 213, 108 S.Ct. at 2347 and 2349, 101 L.Ed.2d at 196–97 and 199. "See also *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972) (the privilege 'protects against any *disclosures* that the witness reasonably believes (emphasis added). 'Unless some attempt is made to secure a communication-written, oral or otherwise-upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one.' 8 Wigmore § 2265, p. 386." *Doe,* 487 U.S. at 211, 108 S.Ct. at 2348, 101 L.Ed.2d at 197.

An examination of Court of Appeals and District Court opinions, however, furnish a more direct answer to whether Cooke is protected in those situations where Carter dictated to him what to write.

Only two Courts of Appeal have confronted the issue of dictation and the Fifth Amendment. The first to do so was the Ninth Circuit in *United State v. Pheaster*[97] upon which the State relies. A government agent dictated to Pheaster what he was to write. As here, the reason was that the unknown writings contained unusual spelling errors. The same mistakes were repeated in the dictated exemplars. The Court said it was a distinction without a difference that to reveal spelling mistakes is to show a product of his mind which is a communication versus simply an identifying characteristic in penmanship.[98] *Pheaster's* continued viability in the 9th Circuit was confirmed in *United States v. Hinton.*[99]

The other Circuit Court of Appeal to address this issue is *United States v. Campbell.*[100] In *Campbell*, the government wanted to dictate what it wanted the defendant to write. The purpose *was* to see how the defendant spelled some words. The First Circuit chose to disagree with *Pheaster*. In so doing, the Court said:

> We remain of opinion, however, that spelling is an intellectual process as distinguished from the pure physical habit or characteristics that make handwriting demandable, and are surprised at the government's persistence in arguing otherwise. Requiring an intellectual process; however subtly, over objection, is a clear violation of the Fifth Amendment.[101]

What is interesting is how the Court in *Campbell* directed would be done in the new trial that it ordered:

> Nor will we accept the government's undertaking not to rely upon misspelling comparisons. Even if no mention were made of it, jury could well notice a duplication of mistakes. On the new trial we will permit the use of dictated exemplars, but only on the basis that, if any misspelling occurs, the jury be instructed-whether in fact true or not-that the government dictated the spelling, and that no inference is to be drawn there from. If defendant refuses to comply even on this basis, comment on the refusal shall be permitted.[102]

This Court will discuss later the remedy options that may be available in light of its substantive ruling on this second group of exemplars.

A smattering of district courts and a few state courts have been asked to rule on this issue. For the most part the conclusions have been the same holding as in *Campbell*: dictated exemplars are a Fifth Amendment violation. These cases are:

> *United States v. Watkins.*[103] It expressly disagreed with *Pheaster* and followed the reasoning in *Campbell*. Producing a dictated exemplar is asking a defendant to demonstrate cognitive abilities. The Court declined the government's suggestion to have the jury instructed misspellings were at government's dictation and there should be no inference.

> *United States v. Matos.*[104] There was an important misspelling to be compared in this case. The court said if a word is

**97.** 544 F.2d 353 (9th Cir.1976).

**98.** *Id.* at 372.

**99.** 1999 WL 712521 (9th Cir.1999).

**100.** 732 F.2d 1017 (1st Cir.1984).

**101.** *Id.* at 1022.

**102.** *Id.*

**103.** 1996 WL 712665 (D.Colo.1996).

**104.** 990 F.Supp. 141 (E.D.N.Y.1998).

testimonial as it is a result of the operation of a person's mind. That is protected by the Fifth Amendment. *Goodson v. Ault.*[105] This case is in accord with the above regarding the Fifth Amendment Protection against dictated exemplars. *United States v. Carrasquillo.*[106] The court said exemplars with misspelled words are testimonial and protected. It did, however, permit introduction of exemplars that did not have misspellings. But, importantly for this case, the court fashioned a remedy that differed from that noted earlier in *Campbell.* That remedy will be reviewed below.

*United States v. Kallstrom.*[107] The Court said, "Obtaining a handwriting sample by dictation allows the examiner to pose spelling questions to the subject which are answered in the exemplar."[108] The court further noted dictation enables the examiner to probe a defendant's level of education, scope of vocabulary, etc., much more than characteristics of handwriting.[109] It ordered the government to get its exemplars by copying from a prepared text.

Two state courts have offered opinions on this subject with slightly but not substantively different results:

*Commonwealth v. Buckley.*[110] The court allowed dictation but there were no misspellings in the suspect writings unlike here. It should be noted, however, the court found there was a *Miranda* waiver which allowed this.

*People v. Kabir.*[111] The writings to be copied were from fraudulent prescriptions. The court was dealing with a motion to compel giving exemplars. The motion was granted with a specific proviso. The handwriting could be compared and used at trial, but there could be no reference to misspelled words or the correct spelling of jargon.

After reviewing and considering all of these decisions, this Court holds that, where Carter dictated to Cooke what to write, constituted a violation of his right against self-incrimination as protected by the Fifth Amendment. This view is particularly reinforced where there are spelling and/or grammatical errors and there is a conscious effort by dictating to get them repeated. Those kinds of situations delve into a person's thought process, and as several courts have noted, would not be allowable if a defendant were verbally asked to spell a certain word or words. Spelling and proper use of grammar are more of an intellectual functioning than the rote way a person writes.

In this case, the protection must apply. There are several reasons. There are spelling and grammar errors in the writings at the crime scenes, certainly at the Bonistall apartment. Another reason appears in the videotape. When Carter was dictating to Cooke what she wanted him to write, he asked her about what she was dictating. Two examples are when she said "turning" and "we'll." The Court when viewing the videotape, as well as Cooke when given the exemplar, was unsure if Carter misspoke in saying "turnin' ", "turn in" or "turning." Cooke also asked her if she meant "will" or "wheel" or whatever. His very questions betray the delving into his intellectual functioning. Her session with him was a spelling and grammatical test, and to some degree a diction exam or exercise.

105. 2000 WL 34032816 (N.D.Iowa 2000).

106. 2004 WL 102774 (S.D.N.Y.2004).

107. 446 F.Supp.2d 772 (E.D.Mich.2006).

108. *Id.* at 776.

109. *Id.*

110. 410 Mass. 209, 571 N.E.2d 609 (1991).

111. 2006 WL 3069280 (N.Y.Sup.).

These exemplars, therefore, where Carter dictates the words to be written, namely, 4, 5, 6, 8, 9, 10, 12, 13, 14, 16, 17, 18, 20, 21, 22, 24, 25, 26, 28, 29, 30, 32, 33, 34, 36, 37, 38, 40, 41, 42, 45, 46, 48, 49, 50, and 52 are suppressed and inadmissible and cannot be used as a basis for determining if Cooke wrote on the walls of either location. Several of these exemplars fall into a gray zone between replicating prepared text and outright dictating what Cooke was to write. They are exemplars 17, 21, 33, and 49. On number 17, Carter asked Cooke to write "White Power" and "KKK." On 49, she asked him to write, with no style specified, "KKK." On none of these four pages were these words or letters already present. Even so, with Carter's instructions, sometimes lack of instruction, there is enough of a testimonial act or privileged thought process involved to hold the privilege protection applies to them. It should be repeated that the Carter's instruction to print any of these numerous exemplars is itself not a violation. Number 52 is a free flowing statement by Cooke which has no bearing on any writings at either crime scene. Such a free flowing exemplar, that is Cooke was allowed to write anything he wanted, is a product of his intellect in a different but equally protected way.[112]

Earlier the Court noted several remedies employed by other courts which found constitutional protection against dictated exemplars. In *Kabir*, a New York Supreme Court allowed dictated exemplars to be used for comparison purposes but there could be no reference to misspelled words or correctly spelled jargon. In *Carrasquillo*, the remedy employed was much stricter and has some potential application here. That is so because Carter has other known exemplars of Cooke's. The court's remedy is stated:

Defendant also moves to suppress the expert report of the government's document examiner, as it was based in party on testimonial handwriting exemplars. The government represents that the expert who prepared the report will at trial base his testimony only on a comparison of the handwriting characteristics in various samples, and not upon the defendant's spelling.

The expert report at issue offers no insight as to the extent to which it relies on the spelling used in the handwriting exemplars. All that is clear is that the expert viewed some exemplars containing spelling errors. In light of this taint, the government must do more than recite its expert's ability to base her opinion on consideration of the handwriting alone. Either a revised opinion from this expert or, perhaps even better, an opinion from an expert who has not seen the misspelled exemplars is now necessary.[113]

Since this Fifth Amendment issue arose some time after the November 9th hearing, the Court has no grasp of Carter's ability to opine about comparisons based on exemplars obtained from other sources or to opine without using the above numerated exemplars to be excluded as a basis of comparison. Nor since Cooke wrote prepared text exemplars in cursive and did not print as directed, the Court is unclear of the comparison value of these exemplars to the writings from the two crime scenes.

Another alternative suggests itself, but this will require input from counsel for both sides. It would be to have Cooke copy from prepared texts all the words or phrases from the two crime scenes. The Court, if this route is undertaken, sees no constitutional impediment to directing Cooke to *print* the same words or phrases.

---

**112.** See *Muniz* quote, *Supra.* pp. 54–55.

**113.** *Carrasquillo*, 2004 WL 102774 at *4.

There may be an option for the State if he again declines and says what he said in the original session that he does not print.

The Court is also unaware if Carter possesses known printed handwriting samples of Cooke. There is a suggestion that she does since at least once on the videotaped exemplar session, she tells him she knows he can print.

The next step regarding the handwriting analysis and comparison will await a conference with counsel. The options discussed in this opinion are not meant to be exhaustive or indicative of any direction the resolution of this issue might take, keeping in mind the proximity to the start of trial.

### *Conclusion*

The Court's decision on each of Cooke's ten motions are, subject to any further rulings at trial:

1. DNA predictive analysis: objection moot as State will not seek to introduce.

2. Video Enhancement: ruling deferred until *Daubert* hearing during trial.

3. Trace (hair) comparison: admitted.

4. Toolmark examination: admitted.

5. Hair comparison: admitted.

6. Fingerprint comparison: admitted.

7. Voice identification: inadmissible.

8. Footwear comparison: admitted.

9. Fabric impression: inadmissible

10. Handwriting comparison: admitted in part, inadmissible in part; other rulings may follow.